## In the Matter Of:

## WASHINGTON vs CONTINENTAL TIRE

#3:20-cv-04056-mgl-svh

---

## GARY WASHINGTON

*March 01, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        Q     And are you comfortable moving
 2   forward with today's deposition?
 3        A     I am.
 4        Q     And Mr. Washington, I'm going to
 5   hand you your medication back.  Thank you.
 6   Mr. Washington, did you review today's -- your
 7   lawsuit -- excuse me -- your complaint in
 8   preparation for today's deposition?
 9        A     No.  No.  No.
10        Q     No.  Did you meet with your
11   attorney, Ms. Robinson in preparation for
12   today's deposition?
13        A     Yes.  Discussion.
14        Q     Okay.  And I don't want to know what
15   you and Ms. Robinson talked about.  I just
16   wanted to ask you if you've met with her in
17   preparation for today.  And I believe your
18   answer to that question is yes.
19        A     Yes.
20        Q     Mr. Washington, what is your date of
21   birth?
22        A     Redacted for Privacy /1962.
23        Q     Where were you born?
24        A     Charleston in South Carolina.
25        Q     And this will not be filed in the
```



```
 1        A     Gary Washington, II.
 2        Q     What is the name of your 35-year-old
 3   child?
 4        A     Rene Michele Washington.
 5        Q     Where does Gary Washington, II live?
 6        A     In Florida.
 7        Q     In what city in the state of
 8   Florida?
 9        A     Orlando.
10        Q     Where does your daughter, Rene
11   Michele Washington live?
12        A     Outskirts of Atlanta.
13        Q     The outskirts of Atlanta, Georgia?
14        A     Yes.  Johns Creek.
15        Q     Other than the charge of
16   discrimination that you filed against
17   Continental with the E.E.O.C., the South
18   Carolina Human Rights Commission, have you ever
19   filed any other charges of discrimination with
20   the E.E.O.C. or similar state agency against an
21   employer?
22        A     No.
23        Q     Have you ever been a plaintiff in
24   any lawsuit other than the lawsuit that you --
25   you've filed against Continental that we're
```



1   discussing today?

2        A      Yes.

3        Q      And what matter were you a plaintiff

4   in?

5        A      I brought a lawsuit against a small

6   business for not paying 60,000 dollars for a

7   contract I helped them to win.

8        Q      Where was that lawsuit filed?

9        A      Richland County.

10        Q      Richland County, South Carolina?

11        A      Yes.

12        Q      Were you the named plaintiff in that

13   lawsuit or was it a business entity was the

14   named plaintiff?

15        A      My business.

16        Q      Your business was the named

17   plaintiff?

18        A      Correct.

19        Q      What business?

20        A      Carolina Procurement Institute.

21        Q      When was that case filed, to the

22   best of your recollection, in Richland County,

23   South Carolina?

24        A      It's awhile.  12 or 13 years ago.

25        Q      You believe that they'd been filed



```
 1   12 or 13 years ago?

 2          A     Yes.

 3          Q     And what entity did you name the

 4   defendant in that lawsuit?

 5          A     Cabra Construction.

 6          Q     Can you spell the first name?

 7          A     C-A-B-R-A Construction.  I believe

 8   that is it.

 9          Q     And has that matter been resolved?

10          A     Yes.  We won the 60,000 dollar

11   amount.

12          Q     You recovered 60,000 dollars in the

13   lawsuit against Cabra Construction?

14          A     I did not recover.  I won the case.

15   I did not go further.

16          Q     Other than the lawsuit that you

17   brought against Cabra Construction, have you

18   ever been a plaintiff in any other lawsuit,

19   other than the lawsuit against Continental?

20          A     No.  Not that I can think of.

21          Q     Have you ever been arrested?

22          A     Yes.

23          Q     On how many occasions?

24          A     The D.U.I. that I mentioned to you

25   and then in the military.
```



1      A      I can't recall.  That's when my

2    mother passed.  I think I was in school getting

3    signed out.

4      Q      You said you think you were in

5    school when it signed out in April 2019?

6      A      Yes or no, but probably -- I'm not

7    positively sure.

8      Q      When you were attending Morris

9    College, was Continental Tire paying for that?

10     A      No.

11     Q      Was Continental Tire reimbursing you

12   for courses that you were enrolled in at Morris

13   College?

14     A      No.

15     Q      Were you ever employed by Morris

16   College?

17     A      I had a contract with them, yes.

18     Q      Is that a 5,000 dollar contract you

19   obtained from Morris college?

20     A      Yes.  As a contractor.

21     Q      Mr. Washington, we are going talk

22   now about how you came to be employed by

23   Continental Tire.  When did you first start

24   working at Continental Tire?

25     A      Probably late 2017 or beginning of



1    '18, I think.  Through a temp service.

2        Q    So the first time you began working

3    at Continental Tire, you were engaged through a

4    temporary staffing service?

5        A    Yes.

6        Q    And during your engagement at

7    Continental as a temporary -- engaged through a

8    temporary staffing service, what types of duties

9    were you performing at Continental?

10       A    Preparing tires.

11       Q    Preparing tires?

12       A    It's called -- it's executing a

13   machine that was prepar--- putting all of the

14   materials of the tire together for the end

15   product.  Tire build.

16       Q    Tire build?

17       A    Yes.

18       Q    And just make sure you continue to

19   make your answers audible.  And was this at

20   Continental Sumter, South Carolina plant?

21       A    Yes.

22            COURT REPORTER:  Ms. Pinson, I'm

23   sorry to interrupt.  But Mr. Washington, could

24   you speak up a little bit.  I'm having a little

25   trouble hearing you.  Thank you so much.  Sorry



GARY WASHINGTON                                  March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              28

1          A     Yes.

2          Q     If you could turn back to the first

3    page of the document.  In the upper, left-hand

4    corner, you'll see that there's a date of

5    application.  The document states June 27th,

6    2017.  Did I read that correctly?

7          A     Yes.

8          Q     Does that sound about right from the

9    time that you submitted this application for

10   employment with Continental Tire?

11         A     Yes.

12         Q     Now, if you could turn to the third

13   page of the document which is Bates number

14   continental number 7.  In the bottom, right-hand

15   corner.  Up at the top, you're asked to identify

16   some appointment.  Do you see that on this

17   document?

18         A     Yes.

19         Q     And you've identified some previous

20   employers and those are Carolina Procurement

21   Institute and D-E-S-A.  Did I read those

22   correctly?

23         A     Yes.

24         Q     Carolina Procurement Institute, you

25   indicate on this document that you were the



1    You provide some references at the top document.

2         A    Yes.

3         Q    And the first reference you give is

4    Loretta --

5         A    Kneal.

6         Q    Kneal.

7         A    Kneal.  It should be K-N-E-A-L.

8         Q    Loretta Kneal.  And where did you

9    work with Loretta Kneal.

10        A    At D.E.S.A.

11        Q    You also identify Cynthia Aike.

12        A    It should be A-I-K-E-N.  Aiken.

13        Q    Cynthia Aiken.  Where did you work

14   with Cynthia Aiken?

15        A    She was a client and a business

16   owner.

17        Q    Now, you testified earlier that your

18   employment with Continental Tire first commits

19   through a temporary staffing agency.  Is that

20   right?

21        A    Yes.

22        Q    At some point, did you become a

23   permanent full-time employee of Continental

24   Tire?

25        A    Yes.



```
 1         Q      Does January 2018 sound accurate to
 2    you?
 3         A      Yes.
 4         Q      Did you interview with anyone at
 5    Continental Tire prior to obtaining that
 6    full-time employment in January of 2018?
 7         A      I think Oscar Boyle.
 8         Q      Do you believe you've interviewed
 9    with anyone else at Continental Tire prior to
10    obtaining full-time employment?
11         A      H.R., a lady, I don't remember her
12    name.
13         Q      Anyone else?
14         A      And yes.  A woman that was my
15    trainer.  I don't remember her name.
16         Q      And you were offered full-time
17    employment at the Sumter, South Carolina plant?
18         A      Yes.
19         Q      Do you know who made the decision to
20    hire you as a full-time employee at the Sumter
21    South Carolina plant for Continental?
22         A      The lady I mentioned and Oscar
23    Boyle.  The trainer and Oscar Boyle.
24         Q      Make sure you state that
25    Mr. Washington.
```



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              33

```
 1         A     Yes.
 2         Q     Did you work with South Carolina
 3   Sumter plant for the duration of your employment
 4   with Continental?
 5         A     Yes.
 6   (EXHIBIT NUMBER 2
 7   MARKED FOR IDENTIFICATION.)
 8   By MS. PINSON:
 9         Q     Mr. Washington, I'm going to hand
10   you what's marked as deposition exhibit number
11   2.  And Mr. Washington, what does deposition
12   exhibit number 2 appear to be to you?
13         A     Terms and conditions of the contract
14   with Continental Tire and myself.
15         Q     Does it look like an offer of
16   employment with Continental Tire to you?
17         A     Yes.
18         Q     Do you recall receiving this offer
19   of employment from Continental Tire?
20         A     I do.
21         Q     And if you could turn to the second
22   page of the document at the bottom of the
23   document.  Is that your signature?
24         A     Yes.
25         Q     And according to this document, you
```



1  Continental Tire?

2       A    I don't remember the shift.

3       Q    And by shift, we mean what hours of

4  the day you were working at that period of time.

5  Is that correct?

6       A    Correct.

7       Q    And you don't remember what hours of

8  the day you were working at the time of your

9  employment at the Sumter plant ended?

10      A    Correct.

11 (EXHIBIT NUMBER 3

12 Marked for Identification.)

13 By MS. PINSON:

14      Q    Mr. Washington, I'm going to hand

15 you deposition exhibit number 3.

16 Mr. Washington, I've just handed to you

17 deposition exhibit number 3.  Is that your

18 signature on the bottom left-hand portion of

19 this document?

20      A    Yes.

21      Q    And then throughout the document,

22 there's various places to initial.  Are those

23 your initials on the document?

24      A    Yes.

25      Q    When you first began your employment



1   with Continental as a tire build operator, who

2   did you report to?

3        A    Would you clarify?

4        Q    Sure.  When you first began working

5   as a full-time permanent employee of Continental

6   Tire at the Sumter plant as a tire build

7   operator, do you remember who your direct

8   supervisor was?  Who you reported to directly?

9        A    I believe Oscar Boyle.

10       Q    Did you report to Oscar Boyle as a

11   direc--- directly for the duration of your

12   employment?

13       A    No.

14       Q    So at some point, your direct

15   supervisor changed?

16       A    Depending on the shift, yes.

17       Q    Do you know who Oscar Boyle reported

18   to when -- when you reported directly to

19   Mr. Boyle?

20       A    No.

21       Q    Did he report to Clayton Tucker?

22       A    I don't know if he -- who he

23   reported to.

24       Q    You don't know who Mr. Boyle

25   reported to?



1  day from Mr. Boyle, do you know one way or the

2  other if he reported to her?  If Mr. Boyle

3  reported directly to her?

4       A    I think that was her -- his boss.

5  Yes.

6       Q    That's what you believed to have

7  been his boss?

8       A    Correct.

9       Q    Was your direct supervisor ever John

10 Stein?

11      A    Yes.

12      Q    When was Mr. Stein your direct

13 Supervisor?

14      A    When I was on the shift and he was

15 over.

16      Q    So you reported to Mr. Stein when

17 you worked the shift that Mr. Stein was

18 responsible for?

19      A    Correct.

20      Q    Do you know when you might have

21 worked a shift for which Mr. Stein was

22 responsible?

23      A    Give me the question again.

24      Q    Sure.  Do you -- do you remember at

25 what periods of time you may have worked a shift



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                           43

1        A     Accept with response.

2        Q     Accept with response?

3        A     Yes.

4        Q     Now Mr. Washington, am I correct

5   that during your employment with Continental

6   Tire, you sought some leave under the Family and

7   Medical Leave Act related to the need to care

8   for your wife, Michele?

9        A     Yes.

10        Q     So you had some experience with

11   Continental's F.M.L.A. request process from

12   having sought leave to care for Michele.  Is

13   that correct?

14        A     Yes.

15        Q     If I refer to the F.M.L.A. today,

16   are we in agreement that I'm referring to the

17   Family and Medical Leave Act?

18        A     Yes.

19        Q     Okay.  And I'll try to refer to the

20   Family and Medical Leave Act, but it's sometimes

21   easier for me to just say F.M.L.A.  Now, do you

22   recall when your leave under the Family and

23   Medical Leave Act commenced for your need to

24   care for your wife, Michele?

25        A     No.



1        Q     Would December of 2018 sound

2    accurate to you?

3        A     Yes.

4    (EXHIBIT NUMBER 8

5    MARKED FOR IDENTIFICATION.)

6    By MS. PINSON:

7        Q     Mr. Washington, I'm going to hand

8    you deposition exhibit number 8.  All right.

9    Mr. Washington, I've just handed you deposition

10   exhibit number 8.  Does this appear to be an

11   F.M.L.A. leave request form that you completed

12   during your employment with Continental Tire?

13       A     Yes.

14       Q     And there's handwriting on the

15   document.  Is that your handwriting on the first

16   page of deposition exhibit number 8?

17       A     Yes.

18       Q     And if you could turn to the second

19   page of deposition exhibit number 8, there's an

20   employee statement at the top, on the second

21   page.  Is that your signature under the employee

22   statement?

23       A     Correct.

24       Q     And according to this document, you

25   completed this F.M.L.A. leave request form on



GARY WASHINGTON                                        March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                      45

 1  December the 13th, 2018.  Does that sound right
 2  to you?
 3          A     No.
 4          Q     When do you believe you completed
 5  this form?
 6          A     I believe it was the date that I put
 7  on the -- on the document initially.
 8  12/13/2015.  But that was incorrect at that time
 9  and I just -- and they told me what I needed to
10  do and I did it.  But initially, when Michele
11  went into a coma, I just did whatever they told
12  me to do.  I put the two-thousand--- 12/13/2015
13  and then the person just said, this is what you
14  need to do.  And they -- they just said, you
15  initial this, this and this leave.  And I did
16  it.  But it -- it had to be in 2018.
17          Q     Okay.  So --
18          A     But the document says 2015.
19          Q     Well, if you turn to the second page
20  of the document --
21          A     Yes.
22          Q     Beside your signature on the second
23  page of the document, there is a date.  Do you
24  see the second page of the document that I've
25  handed to you?



1          A      I do.

2          Q      It's Bates number Continental 18.

3     Can you please turn to that?

4          A      Yes.

5          Q      And you see beside your signature,

6     December the 13th, 2018?

7          A      That's right.

8          Q      Is that the accurate date that you

9     submitted this leave request form?

10         A      Yes.

11         Q      And so the date that's on the first

12    page of deposition exhibit number 8, where it

13    indicates December 13, 2015, that was an error?

14         A      To me, at the time, it was not an

15    error.  I was discombobulated.  But the bottom

16    line is, it had to be an error.  Because I wrote

17    it and then I signed it saying it was correct.

18    Because on -- on the final page where it says

19    12/18/18, all of the information had to be

20    correct.  So I was saying that 2015 was correct.

21    But nonetheless, it was 2018.  I was not at

22    Continental in 2015, although I wrote this.  So

23    that was an error.

24         Q      Okay.  So the error, 12/13/15.

25    Okay.  Now, on this document -- in the middle



1  portion of the document, you indicate on here

2  that you need leave to care for your spouse.  Is

3  that right?  Michele?

4          A       Yes.

5          Q       Now, am I correct that on this

6  form -- if you look at the middle part of

7  Continental 17, there's also a place that you

8  can check to seek leave to care for your parent.

9  Do you see that?

10         A       When was that notation?

11         Q       Sure.  On the first page of

12 deposition exhibit number 8 which is Continental

13 17.  Am I correct that there's also an

14 opportunity for someone to say that they needed

15 leave to care for their parent?

16         A       Correct.  I see that.

17         Q       Okay.  And in fact, you

18 inadvertently selected that you needed to leave

19 to care for your parent at first and then

20 corrected that.  That it was for your spouse,

21 Michele.  Is that right?

22         A       That's right.

23         Q       Now, how did you get deposition

24 exhibit number 8?  How did you come to obtain it

25 and complete it?  Do you remember?



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              48

```
1         A      Based on this date, I think it was
2   H.R. that called me.  Ashley Cox.  And took me
3   upstairs to her office.  And I signed and filled
4   this out.
5         Q      So you believe someone at H.R. gave
6   you deposition exhibit number 8 to complete?
7         A      Yes.
8         Q      And do you recall who you submitted
9   this form to or did you give it to Ashley Cox?
10        A      On the spot.  We did it right there
11  in the office.  Yes.
12        Q      And you believe Ashley Cox was in
13  human resources at the Continental Sumter Plant?
14        A      Well, I never knew her, but she was
15  in charge of getting me vacation or time away to
16  go be with Michele.
17        Q      Okay.
18        A      So I would imagine, at the time she
19  had to be H.R.
20        Q      So Ashley Cox helped you with
21  obtaining time away to care for your wife,
22  Michele?
23        A      Yes.
24        Q      Now, other than this form that you
25  completed, this deposition exhibit number 8 for
```



1    the time that you needed away -- away from work

2    to care for your wife, Michele, did you ever

3    request or complete this form any other time

4    during your employment with Continental?

5         A    I do not believe so, no.

6         Q    If you could turn to the last page

7    of deposition exhibit number 8 which is marked

8    Continental 21 in the bottom, right-hand corner.

9    Do you see it, Mr. Washington?

10        A    I do.

11        Q    Is that your signature on deposition

12   exhibit number 8 at Continental Bates number 21?

13        A    Yes.

14        Q    And there's an employee number on

15   the document.  Was that your employee number

16   during your employment with Continental on the

17   last page of deposition exhibit number 8?

18        A    Yes.

19        Q    Do you remember signing deposition

20   exhibit number 8 at Continental 21?

21        A    Yes.  I do remember signing this.

22             MS. PINSON:  Okay.  We'll go off the

23   record and take a quick bathroom break.

24             (OFF THE RECORD)

25             MS. PINSON:  Amber and



1    Mr. Washington, I just want to put something on

2    the record before we continue the deposition.

3    At approximately 11:00 this morning,

4    Mr. Washington indicated that he needed to

5    attend to a matter at work.  We agreed to

6    accommodate Mr. Washington and to take an early

7    lunch and allow Mr. Washington until noon to

8    attend to the matter and return for his

9    deposition.  He has now returned for the

10    continuation of his deposition.  While the

11    parties will take some additional short breaks

12    throughout the day to use the restroom and the

13    like, the parties have agreed not to break for

14    lunch to accommodate Mr. Washington's need to

15    depart a few minutes ago to attend to a work

16    matter.  Amber, does that accurately summarize

17    our agreement?

18                MS. ROBINSON:  That does.  Thank

19    you.

20                MS. PINSON:  Mr. Washington, are you

21    ready to continue?

22                THE DEPONENT:  I am.

23                MS. PINSON:  Thank you.

24    By MS. PINSON

25        Q    All right.  Mr. Washington, you may



1  remember before you departed that we were

2  talking about a leave of absence that you took

3  under the Family and Medical Leave Act to attend

4  to -- need to care for -- need to care for your

5  wife.  Do you recall us talking about that?

6       A    Yes.

7  (EXHIBIT NUMBER 9

8  MARKED FOR IDENTIFICATION.)

9  By Ms. Pinson:

10      Q    Okay.  And if -- I'm going to hand

11  you now what's was going to be marked as

12  deposition exhibit number 9.  Mr. Washington,

13  deposition exhibit number 9 has just been handed

14  to you.  And if you can look at the middle

15  portion of the first page under section two.  Do

16  you see section two of the document?

17      A    Yes.

18      Q    And is that your handwriting under

19  section two of the document?

20      A    Yes.

21      Q    And if you look at the bottom of

22  deposition exhibit number 9 on the first page,

23  is that your signature at the bottom of the

24  document?

25      A    Yes.



GARY WASHINGTON                                        March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                     52

1          Q      And it appears you signed this

2     document on December the 13th, 2018.  Does that

3     sound right to you?

4          A      Yes.

5          Q      This form that you completed on the

6     first page, that's deposition exhibit number 9,

7     how did you obtain this form to complete it?  Do

8     you remember?

9          A      I believe I received this from

10    Ashley Cox.

11         Q      And Ashley Cox is in human resources

12    at Continental?

13         A      Yes.

14         Q      And other than completing this form

15    for the leave that you took to care for your

16    wife, Michele, did you ever complete this form

17    or request it for any other leave during your

18    appointment with Continental?

19         A      No.

20    (EXHIBIT NUMBER 10

21    MARKED FOR IDENTIFICATION.)

22    By MS. PINSON:

23         Q      Mr. Washington, I'm going to hand

24    you what's going to be marked as deposition

25    exhibit number 10.  Mr. Washington, I just



1   handed you deposition exhibit number 10.  What

2   does this document appear to be to you?

3         A     A designation of notice.

4         Q     Under the Family and Medical Leave

5   Act?

6         A     Yes.

7         Q     Do you recall receiving this form,

8   designation notice, under the Family and Medical

9   Leave Act during your employment with

10  Continental?

11        A     I do not.

12        Q     Was your leave for the need to care

13  for your wife when she had serious illness, was

14  that leave under the Family and Medical Leave

15  Act approved by Continental?

16        A     Yes.

17        Q     At the top of the page, there's an

18  e-mail address on deposition exhibit number 10.

19  Is that your e-mail address or was it an e-mail

20  address you maintained?

21        A     Yes.

22        Q     Is that an e-mail address you

23  maintained in 2019?

24        A     I think so, yes.

25        Q     Do you still use the e-mail address



1   expected to review an employee handbook when you

2   were employed at Continental?

3          A    No.

4          Q    When you were employed at

5   Continental, did you understand that Continental

6   had an attendance policy?

7          A    Yes.

8          Q    Okay.  And I believe you run a

9   business.  Is that fair to say?

10          A    Correct.

11          Q    Do you expect your -- do you have

12   any employees in your business?

13          A    Not right now, no.

14          Q    Have you ever had employees in your

15   business?

16          A    Yes.

17          Q    The employees that you have in the

18   businesses that you run, do you appreciate good

19   attendance from your employees?

20          A    Yes.

21   (EXHIBIT NUMBER 11

22   MARKED FOR IDENTIFICATION.)

23   By MS. PINSON:

24          Q    Mr. Washington, I'm going to hand

25   you what's being marked as deposition exhibit



GARY WASHINGTON                                           March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                        62

1      Q      Mr. Washington, did your mother pass

2  away in April of 2019?

3      A      Yes.

4      Q      Did she pass away on April the 10th

5  of 2019?

6      A      Yes.

7      Q      And following your mother's death on

8  April the 10th of 2019, did you receive three

9  days of paid bereavement leave related to her

10  passing from Continental?

11      A      I'm not aware.

12      Q      Do you know one way or the other

13  whether Continental gave you three days of

14  bereavement leave related to the death of your

15  mother?

16      A      I don't remember.  I don't know.

17      Q      Did your employment at Continental

18  terminate?

19      A      Yes.

20      Q      Do you know on what date Continental

21  terminated your employment?

22      A      No.

23      Q      Do you know who made the decision to

24  terminate your employment at Continental?

25      A      Yes.



1    else he shared with you during that

2    conversation?

3         A     That I should have called him

4    before.

5         Q     And what did Mr. Tucker -- did

6    Mr. Tucker elaborate on what he meant by you

7    should have called him before?

8         A     No.

9         Q     Was Mr. Tucker referring to you

10   should have called to let him know you weren't

11   going to be at work?

12        A     No.

13        Q     But you don't know what Mr. Tucker

14   was referring to?

15        A     No.  Not at the time, no.

16        Q     Okay.  Do you know when Continental

17   made the decision to terminate your employment?

18        A     I would say, no.  When he told me,

19   he had that hour, I think.

20        Q     That wasn't my question.  My

21   question was, do you know when the decision was

22   made to terminate your employment?  What day?

23        A     To answer your question, no.

24        Q     Mr. Washington, do you know whether

25   Continental Tire at the Sumter Plant has



1    terminated other employees for excessive

2    absences?

3         A    I would not know.

4         Q    Are you aware of any employee at

5    Continental, at the Sumter Plant, who exceeded

6    the allowed, unauthorized or unexcused absences

7    under Continental's attendance policy who was

8    not terminated?

9         A    I would not know.

10        Q    Mr. Washington, are you aware of any

11   employee at Continental who exceeded six

12   attendance points in violation of Continental's

13   attendance policy who was not terminated?

14        A    Same answer.  I do not know.

15        Q    After your employment terminated,

16   Mr. Washington, do you know whether Continental

17   posted a vacancy for your tire build operator

18   position?

19        A    I do not know.

20        Q    Mr. Washington, do you know if

21   Continental filled your position?

22        A    Yes.

23        Q    And who do you believe Continental

24   filled your position with?

25        A    I don't know.



1  Oscar Boyle?

2        A     Correct.

3        Q     And these appear to -- at the top,

4  there's a message from you to Mr. Boyle on

5  February the 26th, 2019 that states, okay.  Is

6  that right?

7        A     On the 26th.  Let's see.  I see

8  where it says February 26th and it says, okay.

9        Q     Right.  On February the 26th, 2019,

10  you say okay to Oscar.  Is that right?

11        A     Yes.

12        Q     And then it looks like on April the

13  12th, 2019, at 7:04 in the morning, you send a

14  message to Oscar.  Is that right?

15        A     Yes.

16        Q     And you share with Oscar Boyle on

17  April the 12th, 2019 that your mother passed

18  away.  Is that right?

19        A     Yes.

20        Q     And do you remember sending this

21  message to Mr. Boyle?

22        A     Yes.

23        Q     And in this message, you also tell

24  Mr. Boyle that you let -- I shared with Sup

25  John.  Are you saying that you shared this



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                73

 1   information with your -- with supervisor, John

 2   Stein as well?

 3        A    Yes.

 4        Q    And had you already shared the

 5   information with John Stein at the time you sent

 6   this message on April 12th, 2019 at 7:04 in the

 7   morning to Mr. Boyle?

 8        A    Yes.

 9        Q    And how did you share with Mr. Stein

10   that your mother had passed away?  Was it by

11   text, by phone call?  Do you remember?

12        A    Through the system -- the telephone

13   system that we have to call in.

14        Q    Okay.  So you --

15        A    And they gave me a code number and

16   the lady said she would transfer me and it just

17   dropped off.  And then I called her back, but I

18   had the little number.

19        Q    Okay.  So if I'm understanding your

20   testimony, you called into the -- to the call-in

21   number that Continental has available for

22   employees to utilize when they're going to be

23   absent to let Mr. Stein know that you were going

24   to be absent and that your mom had passed away.

25   Is that right?



1        A    Yes, I believe so.

2        Q    And when you messaged Mr. Boyle on

3    April the 12th, 2019 to let him know that your

4    mother passed away, what was Mr. Boyle's

5    response to your message?

6        A    To this message, he said get things

7    squared with it.  Prior to, I told him the same

8    day my mom passed.  But it's not on a text.

9        Q    Well, my -- my question to you first

10   is, what did Mr. Boyle say to you in the text

11   message?

12       A    I'm sorry to hear this news.  Just

13   as soon as you all make plans, just let me know

14   and we can go from there.

15       Q    Okay.  And you had talked to

16   Mr. Boyle in a telephone conversation prior to

17   this text message exchange?

18       A    I believe it was a text message -- I

19   mean, a phone call --

20       Q    And --

21       A    -- that had been made and through

22   someone to let him know what was going on.

23       Q    And what did Mr. Boyle say in that

24   communication?

25       A    That he is praying for my family.



GARY WASHINGTON                                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                              75

1          Q     Mr. Boyle said he was praying for

2     your family?

3          A     Right.

4          Q     After your mother passed away on

5     April the 10th, 2019, did you ever return to

6     work at the Continental Sumter plant?

7          A     No, I did not return.  No.

8          Q     Do you know if you were scheduled to

9     work on April the 15th of 2019?

10         A     No.

11         Q     No, you do not know?

12         A     Correct.

13         Q     I'm going to hand you a calendar

14    that represents April the 15th of 2019 so we

15    could refer to if that might be helpful.

16         A     Uh-huh.

17    (EXHIBIT NUMBER 13

18    MARKED FOR IDENTIFICATION.)

19    By MS. PINSON:

20         Q     I hand to you deposition exhibit

21    number 13, which represents an April ninety---

22    April, 2019 calendar that I've printed just to

23    help for our discussion.  Now, if you look at

24    that calendar, Mr. Washington, April 15th, 2019

25    is a Monday.  Is that right?



1  right?

2         A     At --

3         Q     If you look at the bottom of

4  deposition exhibit number 12 --

5         A     Yes.

6         Q     -- on April the 19th, 2019, at 8:43

7  in the morning, you send a message to Oscar

8  Boyle.  Is that right?

9         A     Yes.

10        Q     And does that message then continue

11  on at the top of deposition exhibit number 14?

12        A     I don't see a date or time.

13        Q     Well --

14        A     But I do see that the funeral was

15  good -- the funeral was good, complete.  I'll be

16  back.  Could you respond back if John need me to

17  fill out any paperwork.  I need to fill out any

18  paperwork.  Yes.  It looks like a continuation.

19        Q     Okay.  So these are just two

20  separate screenshots of the same conversation

21  that continues from deposition 12 into 14.  Is

22  that right?

23        A     Yes.  I believe so.

24        Q     And so on April of 2019 at 8:43 in

25  the morning, you let Mr. Boyle know that your



1  mother's funeral was complete and that you would

2  be back to work on April the 23rd.  Is that

3  right?

4        A    Yes.

5        Q    Okay.  And then his response to you

6  is that you get three days paid bereavement

7  leave.  Is that right?

8        A    Yes.  I see that.

9        Q    And he also advises you that

10  anything over four days, you would need to go

11  through human resources and claim.  Do you see

12  that?

13       A    Yes.

14       Q    And is -- he's referring to Clayton

15  Tucker there?

16       A    Yes.  I believe so.

17       Q    And what is your response to

18  Mr. Boyle when he tells you you get three days

19  paid bereavement leave and that anything

20  additional, you need to go through H.R. or

21  Clayton Tucker?

22       A    I said, okay.  Thank you or thanks.

23       Q    And do you also tell him that you'll

24  be there at work on April 23rd after class?

25       A    Yes.



1    Q     What day was your mother's funeral?

2    A     I don't remember.

3    (EXHIBIT NUMBER 15

4    MARKED FOR IDENTIFICATION.)

5    By MS. PINSON:

6    Q     Mr. Washington, I'm going to hand

7    you deposition exhibit number 15, which I'll

8    represent to you is an obituary from your

9    mother's funeral.

10    A     Uh-huh.

11    Q     And if you look at that obituary, it

12    indicates that your mother's funeral would take

13    place on Thursday, April the 18th, 2019.  Is

14    that correct?

15    A     Correct.

16    Q     Okay.  So your mother's funeral had

17    already taken place at the time that you

18    messaged Mr. Boyle on April 19th, 2019.  Is that

19    accurate?

20    A     Yes.

21    Q     You -- you advised Mr. Boyle in the

22    text message exchange on April the 19th, 2019,

23    at the top of deposition exhibit number 14, you

24    say, could get any response from John if I

25    needed to fill out any paperwork.  God bless,



1  Gary.  Are you -- who are you referring to when

2  you say John?

3        A    John Stein.

4        Q    Okay.  So had you reached out to

5  John Stein as of April the 19th, 2019?

6        A    Well, before that too.

7        Q    And did you ask Mr. Stein for

8  paperwork?

9        A    No.  I just told him what was going

10  on and he said go back to work and then he'll

11  get with me, but I never talked to him really.

12        Q    And when was this conversation with

13  Mr. Stein?

14        A    I don't know the date.  It's time

15  that I was at work.

16        Q    So Mr. Boyle, on deposition exhibit

17  number 14, tells you that if you want anything

18  above three days paid bereavement leave, that

19  you need to go through human resources.  Do you

20  see that?

21        A    I see that.

22        Q    Did you ever talk to human resources

23  about taking any additional leave after April

24  19th, 2019?

25        A    No.



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                82

1          Q     And you told Mr. Boyle you would

2    return for work on April the 23rd, 2019, after

3    class.  Is that right?

4          A     Yes.

5          Q     When you refer to class, are you

6    talking about classes at Morris College?

7          A     I believe so, yes.

8          Q     So as of April the 19th, 2019, you

9    had represented to Mr. Boyle that you intended

10   to go to class at Morris College on April the

11   23rd, 2019.  Is that correct?

12         A     Or drone class.  I'm not sure which

13   one.  But yes.

14         Q     Or what type of class?

15         A     Drone.

16         Q     Drone?

17         A     Yes.

18         Q     So you don't recall which type of

19   class you intended to go to, but you were either

20   going to go to drone class or classes at Morris

21   College on April the 23rd, 2019?

22         A     Yes.

23         Q     Do you know if you went to class on

24   April the 23rd, 2019?

25         A     I don't know if I did.



GARY WASHINGTON                                          March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                       84

1    letting them know what was going on.

2         Q    Now, the message that you said you

3    left for John Stein, is that a message directly

4    to him or just a message that you left on the

5    call-in number?

6         A    The call-in number, there's a person

7    who picks up the phone.

8         Q    Uh-huh.

9         A    That person is who I gave the

10   message to and they would get that to the

11   supervisor.

12        Q    Okay.

13        A    And when they return, they would

14   give you a number and say, the maintenance or

15   whoever you're calling.

16        Q    Do you know when you called into

17   report that you would not be at work on April

18   the 19th, 2019?

19        A    I don't know if I did, no.

20        Q    So you don't know if you called in

21   to report that you would be absent on April the

22   19th, 2019?

23        A    Correct.

24        Q    Do you know if you were assessed any

25   attendance points for April the 19th, 2019?



1          A     No.

2          Q     No, you do not know?

3          A     I do not know.

4          Q     Do you know if you were assessed any

5    attendance points for April the 20th, 2019?

6          A     No.

7          Q     Is that no, you do not know?

8          A     No, I do not know.

9          Q     Do you know if you were assessed any

10   attendance points for April the 21st, 2019?

11         A     No.

12         Q     Is that no, you do not know?

13         A     No, I do not know.

14         Q     Now, you had represented on April

15   the 19th, 2019, that you would return to work on

16   the evening of April 23rd in this message to

17   Oscar Boyle.  Is that right?

18         A     Be back on the 23rd.

19         Q     Is that -- so you represented to him

20   you would be at work on the 23rd of April?

21         A     Yes.

22         Q     Did you go back to work on the 23rd

23   of April of 2019?

24         A     No.

25         Q     Did you call in to report your



1   absence for April the 23rd, 2019?

2        A     No.

3        Q     Do you know if an attendance point

4   was assessed for your absence on April the 23rd,

5   2019?

6        A     No.

7        Q     Is that no, you do not know?

8        A     No, I do not know.

9        Q     Did you return to work at

10  Continental at any point after April the 23rd,

11  2019?

12       A     No.

13       Q     Were any of your absences -- strike

14  that.  If you could turn back to deposition

15  exhibit number 14.  Do you see the bottom of

16  deposition exhibit number 14?

17       A     Yes.

18       Q     Okay.  And it looks like after you

19  had told Mr. Boyle that you would be at work by

20  April the 23rd, hi--- your next message to him

21  is April the 27th, 2019.  Is that correct?

22       A     27, yes.

23       Q     Did you talk to Mr. Boyle between

24  April the 19th, 2019 and April the 27th, 2019 in

25  any other -- in any other way, by -- by phone,



1   told not to come in, so I would not have called

2   to excuse myself.

3       Q    Were any of your absences following

4   exhaustion of your bereavement leave for your

5   mother's death -- death -- excuse me -- in April

6   2019, were you advised that any of your absences

7   were excused other than the three days you

8   received for bereavement leave?

9       A    I don't know.  No.

10      Q    You don't know?

11      A    No.  I -- I didn't -- I didn't see

12  it.  This is the only communication I had.

13  Correct.

14      Q    And when you're saying the only

15  communication you had, you're referring to the

16  text message exchanges that you just pointed to

17  that are deposition exhibits number 12 and 14?

18      A    Correct.

19      Q    At the time your employment

20  terminated at Continental, do you know how many

21  attendance points you had accumulated?

22      A    No.

23      Q    No, you do not know?

24      A    No, I do not know.

25      Q    Prior to the conversation that



```
 1        A     It was something like this, yes,
 2   what I needed to get to get -- pay for classes.
 3   (EXHIBIT NUMBER 20
 4   MARKED FOR IDENTIFICATION.)
 5   By Ms. Pinson:
 6        Q     I'm handing you deposition exhibit
 7   number 20.  Mr. Washington, does this appear to
 8   be the charge of discrimination that was
 9   submitted to the equal employment opportunity
10   commission following the termination of your
11   employment from Continental?
12        A     Yes.
13        Q     Is that your signature at the bottom
14   left-hand corner of the document?
15        A     Yes.
16        Q     And you signed that document on
17   October the 15th, 2019.  Is that correct?
18        A     Yes.
19        Q     And I'm I correct, in that signing
20   it, you declared under penalty of perjury that
21   everything above your signature is true and
22   correct?
23        A     Yes.
24        Q     And if you could turn to the second
25   page of the document.  Do you see that, it's
```



1   Bates number Continental 99?

2        A      Yes.

3        Q      Is that information that was

4   completed by you or by a lawyer on your behalf?

5        A      This is completed by the attorney,

6   not me.

7        Q      And was that Attorney Alex Kelly?

8        A      Correct.

9        Q      Did you share information with

10  Mr. Kelly that helped him prepare the second

11  page of your E.E.O.C. charge?

12       A      Yes.

13       Q      And does this E.E.O.C. charge appear

14  to be an accurate copy of the charge of

15  discrimination inclusive of the supplement

16  that's at page two that was submitted to the

17  E.E.O.C.?

18       A      Yes.

19       Q      And if you look at the top of the

20  document on the first page of deposition exhibit

21  number 20 --

22       A      Uh-huh.

23       Q      -- you provide your address as 420

24  Lane Chase, Johns Creek, Georgia 30097.  Did I

25  read that correctly?



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              110

1          Q     Do you know what shift -- strike

2     that.  We discussed -- we discussed earlier

3     today communications that you had with Oscar

4     Boyle advising him that you would return to work

5     on April the 23rd, 2019.  Do you recall those

6     conversations?

7          A     Yes.

8          Q     Okay.  Do you know what shift you

9     were scheduled to work on April 23rd, 2019?

10         A     No.

11         Q     No, you do not know?

12         A     I do not know.

13         Q     So if you could turn back to exhibit

14    numbers 12 and 13, which are be text message

15    exchanges that you had with Oscar Boyle.  And

16    just let me know when you're there.

17         A     I'm there.

18         Q     So if you could turn to exhibit

19    number 14.

20         A     Yes.

21         Q     And on April the 19th, 2019,

22    Mr. Boyle tells you you get three days paid

23    bereavement leave.  Is that correct?

24         A     Yes.

25         Q     And beyond Mr. Boyle telling you



```
1    that you had three days of bereavement leave
2    available after your brother's death on April
3    the 10th, 2019, did anyone at Continental tell
4    you that any absences would be excused?
5            A      No.
6            Q      All right.  So I'd like to turn back
7    to your complaint, which I believe is deposition
8    exhibit number 16, your second amended
9    complaint.
10           A      Yes.
11           Q      Okay.  So in paragraph number 15, do
12   you see that?
13           A      Yes.
14           Q      You state that on April the 3rd,
15   2019 you notified your supervisor John Stein
16   that your mother had -- mother had been admitted
17   to the I.C.U. and was near death.  Did I read
18   that correctly?
19           A      Yes.
20           Q      And then you also allege in
21   paragraph 16 that you asked Mr. Stein for
22   permission to go on a leave of absence to care
23   for your mother.  Did I read that correctly?
24           A      You read that right.
25           Q      Okay.  Is -- is that accurate?  Did
```



1   you ask Mr. Stein what you represent in

2   paragraph 16?

3        A    I don't know if that's so because I

4   -- I remember speaking with him face to face.

5   And that was when I told him my mother was

6   deathly ill and I left.  And I didn't talk to

7   him after that.

8        Q    Okay.  So -- so after April the 3rd,

9   2019, you never talked to Mr. Stein again?

10       A    I'm not sure, but I do know that it

11  was -- my last conversation was face to face.

12       Q    With Mister -- your last

13  conversation with Mr. Stein was face to face?

14       A    Correct.

15       Q    And you never returned to work after

16  April the 3rd, 2019 at the Continental Sumter

17  Plant.  Is that correct?

18       A    I'm not certain because she passed

19  on the 10th.  I would have to look.

20       Q    Do you know your last day that you

21  reported to work at the Continental Sumter

22  Plant?

23       A    I do not.

24       Q    And then paragraph 17, Mis--- you

25  state in this complaint, Mr. Stein agreed and



GARY WASHINGTON                                        March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              113

```
 1   asked Mr. Washington to keep him updated.
 2        A     Right.
 3        Q     So Mr. Stein agreed to let you take
 4   some time to care for your mother?
 5        A     Yes, that's face to face at the job.
 6        Q     Was anyone else present to this
 7   conversation that -- that you just -- that's
 8   described in paragraphs 15, 16 and 17 of your
 9   second amended complaint?
10        A     I don't recall.
11        Q     So sitting here today, you can't
12   identify any other witness to this conversation?
13        A     I do not recall.
14        Q     Did you tell -- and this
15   conversation occurred on April the 3rd, 2019?
16        A     I'm not certain the date that it
17   happened.  I just know it was traumatic for me.
18   I took -- I was authorized to leave.
19        Q     Okay.  Mr. Stein authorized you to
20   leave?
21        A     I think he got the authority from
22   Mr. Boyle.  I don't know.  I just know that
23   after I told him, he stepped out then he stepped
24   back in and says, you can go.
25        Q     Okay.  And then your mother passed
```



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              116

1        A      I never spoke with him.

2        Q      Do you know if Mr. Stein tried to

3    call you back?

4        A      Yes.

5        Q      So Mr. Stein tried to call you back,

6    but you never --

7        A      No.

8        Q      -- spoke with him?

9        A      No.  I'm aware -- to answer your

10   question, I'm aware -- I would be aware if he

11   tried to call me because it would have came to

12   my phone, my cellphone or my voice mail.

13       Q      Now, if your cell phone was off and

14   Mr. Stein did not leave a voice mail message,

15   would you have any way to know that Mr. Stein

16   attempted to call your cell phone?

17       A      No.

18       Q      When you had this conversation with

19   Mr. Stein -- face to face with him, which I

20   believe you said was prior to attempting to

21   connect with him by phone.  Is that right?

22       A      Yes.

23       Q      When you had the face-to-face

24   conversation with Mr. Stein and you told him

25   about your mother's illness and wanting to take



1  some time, did you ask Mr. Stein for

2  F.M.L.A. leave during that face-to-face

3  conversation?

4       A    No.

5       Q    During that face-to-face

6  conversation with Mr. Stein, did you mention

7  F.M.L.A. leave at all during that conversation?

8       A    No.

9       Q    Now, when you attempted to be

10 patched through to Mr. Stein using the call-in

11 number, you never got connected to him.  Is that

12 correct?

13      A    Correct.

14      Q    And so you never talked to him again

15 after the face-to-face conversation?

16      A    Correct.

17      Q    So when you called in to the call-in

18 number and asked to be connected to Mr. Stein,

19 do you know who you spoke with?

20      A    No.  A female.

21      Q    And other than it being a female,

22 you don't know who it was you spoke with?

23      A    No.

24      Q    Do you know what depart--- do you

25 know if they're a Continental employee or if



GARY WASHINGTON                                           March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                     126

1        A      No.  But the code would do that.

2        Q      What do you mean the code would do

3    that?

4        A      There is a code that is issued to

5    validate that you were -- before the time you

6    were supposed to work that you contacted them

7    and made them aware, so they could put someone

8    in your place.  That code would identify with

9    whoever issued it or how it came about, so it

10   would be a timeline with that.  And I do

11   believe -- I don't know if it was recorded, but

12   I do know that that's why I waited for a

13   response.  You don't keep -- after you do what

14   you're supposed to do -- that's what you're

15   supposed to do and then they will contact you

16   and move forward.

17       Q      Okay.  My question is a little bit

18   different.  My question is, was there anyone

19   else on the phone call with you and the

20   switchboard person when you --

21       A      No.

22       Q      -- had a conversation with her?

23       A      The answer is no.

24       Q      Who with Continental do you contend

25   retaliated against you under the F.M.L.A.?



 1          A     I contend that it's John Stein.

 2          Q     Anyone other than John Stein?

 3          A     No.

 4          Q     Is it your contention that Mr. Stein

 5     retaliated against you when your employment

 6     terminated?

 7          A     No.

 8          Q     So how do you contend that you were

 9     retaliated against?  How do you contend that

10     Mr. Stein retaliated against you in violation of

11     the F.M.L.A.?

12          A     Communications, things that he said

13     to me.

14          Q     Anything else?

15          A     Places where he removed me from and

16     put me -- located me.

17          Q     Anything else?

18          A     The attitude toward me.

19          Q     Anything else?

20          A     That's it.

21          Q     That's it?

22          A     Correct.

23          Q     What communications are you

24     referring to that Mr. Stein allegedly made to

25     you or with you?



1       A     He asked me my age several times.

2   He asked me when I was going to retire.  He

3   called me old man.  And he pulled me from the

4   job that I was hired to do to work in a -- poor

5   conditions and a -- contrary to what he would do

6   with the other individuals that were my peers

7   and of my -- they would -- they were younger

8   than me.

9       Q     Do you know if Mr. Stein played any

10  role in the decision to terminate your

11  employment?

12      A     I don't know.

13      Q     So I asked you to identify what

14  actions you believe Mr. Stein took against you

15  to retaliate against you in violation of the

16  Family and Medical Leave Act and one of the

17  topics you mentioned was communications.  And I

18  asked you what those were and you mentioned that

19  Mr. Stein asked you about your age, asked you

20  when you were going to retire and allegedly

21  called you an old man.  We'll talk about those

22  topics under your age discrimination claim, but

23  I'm trying to understand what actions Mr. Stein

24  took against you to retaliate against you in

25  violation of the Family and Medical Leave Act.



1      A     They're in there, on the Family and

2   Medical Leave Act.  I was referring to

3   discrimination.

4      Q     So you don't believe Mr. Stein took

5   any action against you to retaliate against you

6   in violation of the Family and Medical Leave

7   Act?

8      A     I don't know.

9      Q     So sitting here today, you don't

10   know whether Mr. Stein did anything to retaliate

11   against you in violation of the Family and

12   Medical Leave Act?

13      A     Correct.

14      Q     Did anyone at Continental ever tell

15   you that you were being terminated for invoking

16   any rights under the FMLA?

17      A     No.

18      Q     Did anyone at Continental ever make

19   any negative comment related to your need to be

20   absent to care for your wife Michele?

21      A     No.

22      Q     Other than what we've talked about

23   thus far, is there any other basis for your FMLA

24   retaliation claim?

25      A     Based on what we've talked about,



1    that's it.

2         Q    Okay. So other that what we've

3    talked about, there's no other basis for your

4    FMLA retaliation claim; is that correct?

5         A    Correct.

6         Q    So let's talk about your age

7    discrimination claim.  So it's your contention

8    in your second amended complaint that you were

9    discriminated against on the basis of your age;

10   is that correct?

11        A    Correct.

12        Q    All right.  And I believe you've

13   identified John Stein thus far.  Is there anyone

14   else other than John Stein you contend

15   discriminated against you on the basis of your

16   age?

17        A    No.

18        Q    And I asked you earlier what actions

19   you believe Mr. Stein took against you, and you

20   identified communications that were made, things

21   that were said by Mr. Stein, his attitude

22   towards you and places where you were relocated.

23   Is that correct?

24        A    That's correct.

25        Q    Is there any other action that you



1    contend Mr. Stein took against you to

2    discriminate against you on the basis of your

3    age?

4          A     I believe that my ratings.

5          Q     Your ratings?

6          A     The ratings on the -- that position

7    provided to me.

8          Q     Performance evaluation ratings?

9          A     Correct.

10         Q     Okay. Anything else?

11         A     No.

12         Q     Do you know whether your performance

13   evaluation ratings had any role in the

14   termination of your employment?

15         A     I do not know.

16         Q     So in your complaint, you allege in

17   paragraph 29, that on at least two occasions in

18   2019, Mr. Stein referenced your age and asked if

19   you were considering retiring.  Did I read that

20   correctly?

21         A     Yes.

22         Q     Do you know how old Mr. Stein is?

23         A     No.

24         Q     Do you know if Mr. Stein is older

25   than you?



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                            132

```
 1        A      I believe he is, yes.
 2        Q      You believe Mr. Stein is older than
 3   you?
 4        A      Yes.
 5        Q      Did Mr. Stein ever talk about his
 6   own plans to retire with you?
 7        A      No.
 8        Q      Do you know whether Mr. Stein has
 9   retired from Continental?
10        A      No.
11        Q      So I'm going to talk about the first
12   conversation that you've identified in paragraph
13   29 of your complaint.  So you allege that on at
14   least two occasions, Mr. Stein referenced your
15   age and asked if you were considering
16   retirement.  Let's talk -- talk about the first
17   occasion.  When do you allege the first
18   conversation took place with Mr. Stein?
19        A      In his office.
20        Q      Okay.  Were there any witnesses?
21        A      No.
22        Q      Okay.  And when did that
23   conversation take place?  Not where.  At what
24   point in time?
25        A      I don't know.  Do not know.
```



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                133

1        Q        Do you know if it was in 2019?

2        A        No.

3        Q        No, you do not know?

4        A        No.

5        Q        And what exactly do you allege

6    Mr. Stein said on this first occasion?

7        A        He wanted to know how old I was, but

8    more importantly, he wanted to know when I was

9    going to be leaving on retirement.  And he did

10   it again later on when he called me over --

11       Q        We're going to talk about first

12   occasion first.

13       A        Right.

14       Q        Okay.  So he wanted to know how old

15   you were and you allege he wanted to know when

16   you were retiring.  Is that correct?

17       A        Yes.

18       Q        Did he say anything else in this

19   first conversation?

20       A        No.

21       Q        Do you know whether Mr. Stein was

22   just having a conversation with you, a friendly

23   conversation?

24       A        For sure I know because he did not

25   have those with me.



1        Q       Oh, Mr. Stein did not have friendly
2    conversations with you?
3        A       No.
4        Q       Did Mr. Stein ever joke with other
5    employees?
6        A       Not that I'm aware of.
7        Q       Do you know whether Mr. Stein joked
8    with other employees?  Do you know one way or
9    the other?
10       A       Not that I'm aware of, no.
11       Q       And in his first conversation, other
12   than asking you how old you were and asking you
13   when you may be retiring or leaving Continental,
14   did Mr. Stein say anything else during this
15   first conversation?
16       A       No.
17       Q       Did you report that conversation
18   that you just described with Mr. Stein to anyone
19   at Continental?
20       A       No.  I did not.
21       Q       So now I want to talk about the
22   second conversation.  When do you allege the
23   second conversation took place with Mr. Stein?
24       A       On the line.
25       Q       On the line?



1         A     And I don't know when.

2         Q     Okay.  When you say on the line, is

3    that a production line?

4         A     Correct.

5         Q     And I believe you said you don't

6    know when this conversation took place on the

7    production line.  Is that correct?

8         A     Correct.

9         Q     Was it in 2019?

10        A     I'm not sure.  However, after that

11   conversation, I started getting moved to a

12   different location.

13        Q     And were you moved to a different

14   location in tire build?

15        A     No.

16        Q     What location were you moved to?

17        A     I believe the section is -- it's

18   actually cooking the tires.  It's heat --

19   heat --

20        Q     Cur--- curing?

21        A     Curing.

22        Q     Okay.  So you got -- took on a

23   function in curing?

24        A     Right.

25        Q     And when you took on that function



```
 1   in curing, was that a permanent basis or do you

 2   take that temporarily?

 3        A     No.  Whenever you felt like it.

 4        Q     So on occasions, you were asked to

 5   fill in in curing?

 6        A     Not asked.  Told.  Yes.

 7        Q     And when you filled in in curing,

 8   about how many occasions do you think that was?

 9        A     Many.  I don't know how many, but

10   many times.

11        Q     Were you still in the role of tire

12   build operator at that time when you were --

13        A     Correct.

14        Q     -- performing in curing?

15        A     Yes.

16        Q     Did your pay ever change?

17        A     No.

18        Q     And you believe the conversation

19   took place on a production line.  Were there any

20   witnesses to the conversation?

21        A     No.

22        Q     And what exactly did Mr. Steff---

23   Stein say in the second conversation that you

24   believe occurred on the production line?

25        A     Similar to the same thing.  When are
```



1   you -- how old are you?  When are you going to

2   retire?

3        Q     Did Mr. Stein say anything else

4   during the second conversation that you believe

5   occurred on the production line?

6        A     Yes.

7        Q     What else did he say?

8        A     That I don't look my age.

9        Q     Do you know if Mr. Stein was

10  suggesting you looked younger than your age?

11       A     I don't know.

12       Q     You don't know what Mr. Stein meant

13  by the comment?

14       A     Correct.

15       Q     Did you report the second

16  conversation that you believe occurred on the

17  production line to anyone at Continental?

18       A     I did not.

19       Q     Now, in paragraph 30 of your second

20  amended complaint, you state that Mr. Stein

21  called you, quote, an old man.  Did I read that

22  correctly?

23       A     Yes.

24       Q     In what conversation did Mr. Stein

25  call you an old man?



GARY WASHINGTON                                        March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                    138

1         A      In the morning times we would
2    meet -- the whole group and we'd get back these
3    are things we need to do and pair up with your
4    partner and go to your machines.  And I was
5    walking when he called me old man, don't go to
6    your machine, you need to come with me.
7         Q      And --
8         A      At that time, he took me to another
9    section, which is repair.
10        Q      So on how many occasions do you
11   contend Mr. Stein called you an old man?
12        A      Two or three.
13        Q      And do you recall when, not where,
14   but when these conversations occurred?
15        A      I don't know the dates, no.
16        Q      Do you know if they were in 2019?
17        A      I'm not certain.
18        Q      So sitting here today, you don't
19   know when these conversations occurred?
20        A      Correct.
21        Q      Do you know if there were any
22   witnesses to any of these occasions where you
23   contend Mr. Stein referred to you as old man?
24        A      I don't remember if anyone -- no.
25        Q      You don't know if there were any



1    witnesses?

2        A    I don't know who they were.  There

3    were witnesses, but I don't know who they are.

4    They were there.

5        Q    And when you say they were there,

6    are these individuals that were just aron---

7    around in the vicinity?

8        A    These were working people, daily

9    workers that I worked with.

10       Q    So folks that you worked with in and

11   around the plant?

12       A    Correct.

13       Q    And you don't know who would have

14   heard it?

15       A    I'm certain many people heard, but I

16   don't know the names of the individuals.  I was

17   only close to one or two people.

18       Q    And in the time your employment

19   terminated, where did Mister -- was Mr. Stein

20   still employed at Continental?

21       A    I don't know.

22       Q    Earlier, when I asked you to

23   identify what actions Mr. Stein had taken

24   against you on the basis of your age, you -- one

25   of the things that you had identified was that



GARY WASHINGTON                                          March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                                       156

1        Q     Is this your belief, Mr. Washington?

2        A     I think it's based on past

3   performance as a company.

4        Q     And --

5        A     That's my belief, yes.

6        Q     That's your belief?

7        A     It is.

8        Q     Is there any other basis for your

9   age discrimination claim other than what we've

10  talked about today?

11       A     No, ma'am.

12       Q     Did anyone at Continental ever tell

13  you that your employment was terminated because

14  of your age?

15       A     No.

16       Q     I believe we talked earlier today

17  about the fact that you applied for unemployment

18  benefits when you were -- back when your

19  employment terminated from Continental.  Is that

20  correct?

21       A     Yes.

22       Q     Do you recall what you were earning

23  from Continental in an hourly rate at the time

24  your employment ended?

25       A     I have to state this here, no.  You



1  wanted to come back.  The 23rd is when I said I

2  was going to come back.  They told me not to

3  come back in, so it had to have been the 24th.

4      Q    Do you know if your employment

5  terminated on April the 24th, 2019?

6      A    That's a yes.

7      Q    How do you know that your employment

8  did not terminate on April the 24th, 2019?

9      A    What was that?

10     Q    Do you know whether your employment

11 terminated on April the 24th, 2019?

12     A    Yes.

13     Q    Okay.  How -- how do you know that?

14     A    Because the day that I wanted to

15 come back to work, I had told them because they

16 said do what you needed to do to you take of

17 your family.  I said I'll be ready to come back

18 on the 23rd.  When I happened to come back on

19 the 23rd, I called.  Based on that information,

20 I was told that you -- you will be speaking with

21 Clayton.  And once I had spoken with him, he

22 said not to come in.  I'm pretty sure that was

23 the day after.  I believe that's when it was, to

24 my best recollection.

25     Q    Do you know --



GARY WASHINGTON                                    March 01, 2022
WASHINGTON vs CONTINENTAL TIRE                              178

1          A      Yes.

2          Q      -- one way or the other whether the

3    conversation that you have described with

4    Clayton Tucker occurred on April the 24th, 2019?

5          A      Oh, for sure.  I do know I -- I

6    spoke with him, yes.

7          Q      On April the 24th, 2019?

8          A      24th, yes.

9          Q      And now, you're also asked here to

10   indicate who discharged you and you provide a

11   name of Nicole per Clayton?

12         A      Correct.

13         Q      Okay.  And help me understand what

14   you meant when you identified that -- when you

15   wrote in this box Nicole per Clayton?

16         A      When I called, that person couldn't

17   contact me.  So this person, Nicole, called me

18   and says Clayton will call you.  I believe

19   that's -- was what he -- she tied it into him.

20   But one way or another, I could not get directly

21   to him.  And I'm not sure if he -- he called me

22   and she had put me on hold or what have you, but

23   she was involved in me actually talking with

24   this individual.

25         Q      And --



## POLICIES

### EMPLOYEE ACKNOWLEDGMENT FORM

All employees of Continental, its subsidiaries and affiliates are expected to comply with the Policies of the Company, whether located on the Intranet[1], Handbook, or otherwise communicated by Continental. However, he Policies do not constitute an employment contract, nor are they intended to make commitments concerning terms of employment with the Company or establish a standard for just-cause terminations. Employment with the Company is "at will". The Company and its employees are in an employment relationship that can be ended by either party, at any time and for any reason that either deems appropriate.

Initials _____

The Company reserves the right to revise, supplement, rescind or make exceptions to any of its Policies from time to time as it deems appropriate, in its sole discretion. It is understood, however, that no person has the authority to alter the terms of these Policies with oral modifications. Only the Vice President of Human Resources may approve a change in these provisions.

Initials _____

I certify that at the time of my orientation process as a new employee, I have been given a copy of, that I have read, and fully understand the following Company Policies:

- Code of Business Conduct / Anti Corruption / Compliance Hotline Policy
- EEO Policy
- Freedom from Unlawful Harassment Policy
- Electronic Media Communication Policy
- Violence Free Workplace

I have been offered an opportunity to ask any questions that I need to ask in order to fully understand the Company's Policies and my rights and responsibilities under them.

In signing this document, I certify that I have reviewed these Policies and that I understand that it is my responsibility to comply with them and any revisions made to them.

Initials _____

I acknowledge that in addition to those Policies listed above, I have received and/or it has been explained to me how I can obtain all Company Policies. I have been offered an opportunity to ask any questions that I need to ask in order to fully understand the Company's Policies and my rights and responsibilities under them. I am aware that if, at any time, I have questions regarding Company Policies I should direct them to the Human Resources department.

In signing this document, I certify that I will review all Company Policies no later than 30 days after my first day of work and that I understand that it is my responsibility to comply with them and any revisions made to them.

Initials _____

I have read and understand the contents of this Acknowledgement Form and agree to abide by its requirements.

| Employee Signature | Employee Name (Printed) | Date |
| --- | --- | --- |
| _(signature)_ | GARY Washington | 01/30/2018 |

EXHIBIT
3

CONTINENTAL 000012



I have attended New Hire Orientation which included information about Continental's Benefit Offerings. I understand from this meeting the following:

1. I have **30 days** from my hire date to enroll in benefits via www.mycontibenefits.com with Continental and failure to do so will result in no coverage for me or dependents, if applicable.

2. I am required to provide Benefitfocus with proper verification documentation as prescribed in the new hire packet and/or on www.mycontibenefits.com that substantiates any dependents that I have added to my benefits. I understand that I have **60 days** from my hire date to provide the required documentation for enrolled dependents to Benefitfocus by faxing the information to: 866-742-6444. It is my responsibility to keep a copy of the confirmed fax transmission sheet that shows proof of transmittal.

3. Should my mailing address change at any point in time, it is my responsibility to log into My HR Self Service to change it. Failure to update local Continental HR with an updated address could cause important information to not be properly communicated that could result in benefits termination.

*By signing this document, I agree that I fully understand the benefit enrollment and verification requirements. If any of the steps outlined above are not fully executed, I understand that it may result in my and/or my dependent's benefits being terminated retroactively to my hire date.*

_____        Gary Waslidge   1/30/2018
Employee Signature                Print Name          Date

_____        _____   _____
HR Signature                      Print Name          Date

CONTINENTAL 000013

**Continental**

Name GARY WASHINGTON
(Print)

Dept. Name_____

Dept. Number_____

Employment Location_____

CONTINENTAL TIRE THE AMERICAS, LLC

A Corporation of the

State of Ohio, USA

## PROPERTY, CONFIDENTIAL INFORMATION
## TRADE SECRETS & INVENTIONS AGREEMENT

IN CONSIDERATION of my employment by Continental Tire Americas, LLC ("Company"), its parent or any of its subsidiaries (collectively referred to as "Employer"),

1.    I shall not disclose to anyone outside of Employer, or use in other than Employer's business, any documents and/or other property of Employer, nor shall I disclosed to anyone outside of Employer, or use in other than Employer's business, any Confidential Information or Trade Secrets relating to the business of Employer or of other companies with whom Employer has a confidential relationship, either during or after my employment by Employer except with Employer's prior written permission or as required by law.

"Confidential Information" shall include all information not generally available to the public that is owned by Employer as a result of the creative and business efforts of its own employees and agents or is in Employer's possession as a result of confidential disclosures from third parties, including suppliers, customers, parent, subsidiary and related companies, technical affiliates and licensors to Employer. "Confidential Information" shall include any of the foregoing information, whether disclosed orally, by written documents, drawings, pictures, audio or video recordings, computer software, and data transmission means, or by visual inspection of any of Employer's production or research and development facilities or business offices. "Confidential Information" shall also include all analyses, compilations and amalgamations of the foregoing information whether made by Employer, recipient or a third party.

"Trade Secrets" means information including, but not limited to, scientific and technical data such as product specifications, drawings, equipment and process specifications and drawings, information relating to the development of new products, equipment and processes, including invention disclosures, reports and correspondence relating to research and product development projects, including work assignment files, test data relating to products, processes and equipment, and shall include non-technical data, financial data or information, lists of actual or potential customers or suppliers, or lists of names, addresses or telephone numbers that is sufficiently secret that it derives economic value, actual or potential, from not being generally known or from not being readily ascertainable by other persons who can attain economic value from its disclosure or use. "Trade Secrets" shall include any of the foregoing information, whether disclosed orally, by written documents, drawings, pictures, audio or video recordings, computer software, and data transmission means, or by visual inspection of any of Employer's production or research and developmental facilities or business offices.

2.    I shall not knowingly disclose to Employer or induce Employer to use any Confidential Information or Trade Secrets belonging to others

3.    I hereby assign to Employers my entire right, title and interest to any invention or idea, patentable or not, which is made, conceived or reduced to practice solely or jointly by me:

  a.    while employed by Employer; and

  b.    which relates in any manner to the manufacture, use or sale of vehicle tires or, to the design, development and/or manufacture of Airsprings, or Suspension systems or any components thereof, or to any other actual or anticipated business of Employer, or relates to its actual or anticipated research and/or development, or is suggested by or results from any task assigned to me or from work performed by me for or on behalf of Employer:

**Ontinental ☘**

   c.  except any invention or idea which I cannot assign to Employer because of a prior invention agreement with_____, which is effective until _____.
       (Give name and date or write "none.")

4.    I agree that in connection with any invention or idea covered by paragraph 3:
      a.  I shall disclose it promptly to Employer's Law Department; and
      b.  I shall, on request, execute a specific assignment of title to Employer and do all else reasonably necessary to enable Employer to secure patent protection therefore in the United States and in foreign countries.

5.    I have listed and identified on the back of the form my inventions or ideas in which I have any right, title, or interest and which were previously conceived; either wholly or in part by me.  (It is your interest to establish that any such inventions or ideas were made before your employment with Employer.  You should not disclose such inventions or ideas in detail, but only identify them by titles and dates of documents describing them)

6.    I agree that upon termination or cessation of my employments with Employer for any reason, I will promptly deliver to Employer all drawings, blueprints, manuals, letters, samples, parts, notes, notebooks, reports, memos, production data, documents and all other material or documentation of whatsoever nature of the Employer, including but not limited to all computer discs and all information stored on computers which are in any way in my possession and/or under my control.  Further, I agree that I will not retain such information outside the workplace.  I acknowledge that Employer can be competitively disadvantaged by the retention of such information and I agree the obligations set forth in this paragraph six (6) shall not be superseded by any oral or written agreement to the contrary.

7.    If given access to Employer's computer system, I agree to use the system for Employer's business purposes and not to its detriment.  I further agree to be responsible for use of my user identification number and passwords and will refrain from disclosing passwords to others.  I agree that copies, extracts or derivates I make of Employer's computer programs or data files not generally available to all or most associates will be retained by me only for a time reasonable under the existing Employer business circumstances and will then be destroyed.  Such programs and data files are *Confidential Information* of Employer.  I also agree not to intentionally attempt to access computer programs or data files I have no authority to access.

8.    I recognize and acknowledge that the Employer has or may have proprietary business practices and trade secrets, lists of customers and other matters which are special and unique assets of the Employer's business.  I agree that I will not disclose such information or any part thereof to any person, firm or corporation, association or other entity for any reason or purpose whatsoever.

9.    I agree that with respect to the subject matter hereof, it is my entire agreement with Employer, superseding any previous oral or written communication, representations, understandings or agreements with Employer or any official or representative thereof.  I understand and agree that the obligations of Paragraphs 1, 2, 3, and 4 extend beyond my employment with Employer and bind my executors, administrators, or other legal representatives.

Witness:_____          Signed_____

Date:_____          Date:_____

CONTINENTAL 000015



## FMLA  REQUEST FORM

**Employee:** GARY WAShington    **Date:** 12/13/15

**Job Title:** Tire Build    **Supervisor:** John SтіNе

To request leave under the Family and Medical Leave Act ("FMLA"), submit this request form to Human Resources at least 30 days before the leave is to commence, when practicable.  If submission of the request 30 days in advance is not practicable, submit the request as early as is practicable. In most cases, it should be practicable to provide notice of the need for leave either the same day the need for leave becomes known or the next business day. Continental reserves the right to delay, or deny leave, for failure to give appropriate notice when such delay/denial would be permitted under federal or state law.

The FMLA entitles eligible employees to take leave for the following reasons (please check the applicable reason for your requested leave):

☐ The birth of a child, or placement of a child with you for adoption or foster care;

☐ Your own serious health condition;

☑ Because you are needed to care for your _____ spouse; _____child; _✓_ parent due to his/her serious health condition;

☐ Because of a qualifying exigency arising out of the fact that your _____ spouse; _____son or daughter; _____ parent is on covered active duty or call to covered active duty status with the Armed Forces; or

☐ Because you are the _____ spouse; _____son or daughter; _____ parent; _____ next of kin of a covered servicemember with a serious injury or illness.

## DATES OF LEAVE REQUESTED:

☐ I request leave from _____ to _____

☑ I request intermittent leave according to the following schedule: _AS  NEEDED  for Appointment for Shelly Starting In June 2018_

☐ I request a reduced schedule leave according to the following schedule: _____

_____

The total number of days of leave that I request is _____

***FAMILY MEDICAL LEAVE ACT***
Page **1** of **2**

## EMPLOYEE STATEMENT:

I certify that the statements made above are true and accurate. I understand that I have an obligation to respond to questions from my employer designed to determine whether my absence is potentially FMLA-qualifying. Furthermore, I understand that if I fail to respond to any reasonable inquiry by my employer regarding this leave request, the employer may deny my FMLA leave request if it is unable to determine whether the leave is FMLA-qualifying.

_Employee Signature_        _Date_ 12/13/18

60009023
_Employee Number_

## TO BE COMPLETED BY HUMAN RESOURCES:

Request for Leave received on: 12/13/2018

Request processed by: Ashley Cox

_Approval Signature_        _Date_ 1/7/2019

**_FAMILY MEDICAL LEAVE ACT_**
Page **2** of **2**

CONTINENTAL 000018



## **EMPLOYEE STATEMENT OF FAMILY RELATIONSHIP DOCUMENTATION**

I hereby certify that

**Redacted for Privacy** ___ (name) is my (check one): ☑

Spouse    ☐ Child    ☐ Mother    ☐ Father

---

I understand that any deliberate misrepresentations made in this statement are punishable pursuant to the Company's policies regarding misrepresentations by employees. I certify that all of the statements made herein are true and accurate to the best of my knowledge and belief.

Employee: Gary Washington    Phone **Redacted for Privacy**

Department: The Build    Supervisor: John Stone

_____    12/13/18

Employee Signature    Date

---

*Do Not Write Below This Line*

_____    12/13/2018

Human Resources    Date

**FAMILY MEDICAL LEAVE ACT**
Page **1** of **1**

Paid Time Off (PTO) and/or Employee Purchased Time Off (EPTO) Request Form

1.  I acknowledge that I am required to use PTO, to the extent it is available (earned but not used), for the waiting period before an approved Medical Leave of Absence can begin. If a Company designated holiday occurs during the waiting period, then the holiday will count toward the waiting period and I will not need to use a PTO day.

    This waiting period applies to all subsequent leave requests for a new, unrelated condition and/or leave requests for the same condition after I have been actively returned to work for more than 90 calendar days. I acknowledge that I understand and agree with the terms of the Medical Leave of Absence (MLOA), Family and Medical Leave (FMLA) and Paid Time Off (PTO) Policies.

2.  If you are on reduced benefit (less than 100% normal base pay), you may apply Employee Purchased Time Off (EPTO), which has been paid for via payroll deduction, or earned Paid Time Off (PTO) time to offset the difference of income. (Refer to Company PTO Policy.) Should I receive any overpayment of STD benefit, the Company has the right to recover those overpayments through subsequent payroll cycles.

    By initialing next to the option(s) below, I agree to utilizing PTO and/or EPTO to offset the difference of income while on leave and understand and agree to the terms of the Paid Time Off (PTO) Policy:

    _____ I formally authorize usage of earned PTO to offset the difference of income while on leave.

    _____ I formally authorize usage of EPTO, if applicable, to offset the difference of income while on leave.

    _____ I formally authorize usage of borrowed PTO against my current year's PTO benefit to offset the difference of income while on leave.

    Gary Washington
    Employee Name (Print)                          12/13/18
                                                   Date

    _____                        12/13/18
    Employee Signature                             Date

    _____                        12/13/2018
    Authorized Continental Representative          Date

CONTINENTAL 000020



## EMPLOYEE'S ACKNOWLEDGMENT OF RECEIPT AND REVIEW OF CONTINENTAL'S LEAVE POLICIES AND FMLA EMPLOYEE RIGHTS AND RESPONSIBILITIES

I, _____ *(print name)*,

an employee of Continental, acknowledge that I have been given a copy of, read, and fully understand the Company's policies and procedures on leaves of absence, including the FMLA Employee Rights and Responsibilities and the following policies:

- FMLA;
- Medical Leave of Absence; and
- Paid Time Off/Vacation Time (if applicable).

I have been offered an opportunity to ask any questions that I need to ask in order to fully understand the Company's policies and my rights and responsibilities under them. I agree that I will comply with these policies and procedures.

_____     12/13/18
Signature                          Date

_____
Employee Number

CONTINENTAL 000021

FAX : 803-506-5195
NLT 1/2/2019

Certification of Health Care Provider for
Family Member's Serious Health Condition
(Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division

**WHD**

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

OMB Control Number: 1235-0003
Expires: 5/31/2018

## SECTION I: For Completion by the EMPLOYER

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave to care for a covered family member with a serious health condition to submit a medical certification issued by the health care provider of the covered family member. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees' family members, created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: Continental Tire -- Ashley Cox
803-506-5372

## SECTION II: For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your family member or his/her medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave to care for a covered family member with a serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form to your employer. 29 C.F.R. § 825.305.

Your name: Gary ___ Allen ___ Washington
First ___ Middle ___ Last

Name of family member for whom you will provide care ___
First ___ Middle ___ Last

Relationship of family member to you: Wife

If family member is your son or daughter, date of birth: ___

Describe care you will provide to your family member and estimate leave needed to provide care:

X Employee Signature ___ X Date 12/13/18

Page 1    CONTINUED ON NEXT PAGE    Form WH-380-F Revised May 2015

Redacted for Privacy

**EXHIBIT**
**9**

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** The employee listed above has requested leave under the FMLA to care for your patient. Answer, fully and completely, all applicable parts below. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the patient needs leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), or genetic services, as defined in 29 C.F.R. § 1635.3(e). Page 3 provides space for additional information, should you need it. Please be sure to sign the form on the last page.

Provider's name and business address: _____

Type of practice / Medical specialty: _____

Telephone: _____

PART A: MEDICAL FACTS

1. Approximate date condition commenced: _____

   Probable duration of condition: _____

   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   __ No ___Yes. If so, dates of admission: _____

   Date(s) you treated the patient for condition: _____

   Was medication, other than over-the-counter medication, prescribed? _____

   Will the patient need to have treatment visits at least twice per year due to the condition? _____

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   If so, state the nature of such treatments and expected duration of treatment:

   _____

2. Is the medical condition pregnancy? _____

3. Describe other relevant medical facts, if any, related to the condition for which the patient needs care (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Redacted for Privacy

CONTINENTAL 000023

**PART B: AMOUNT OF CARE NEEDED:** When answering these questions, keep in mind that your patient's need for care by the employee seeking leave may include assistance with basic medical, hygienic, nutritional, safety or transportation needs, or the provision of physical or psychological care.

4. Will the patient be incapacitated for a single continuous period of time, including any time for treatment and recovery?

Estimate the beginning and ending dates for the period of incapacity:

During this time, will the patient need care?

Explain the care needed by the patient and why such care is medically necessary:

5. Will the patient require follow-up treatments, including any time for recovery?

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

Explain the care needed by the patient, and why such care is medically necessary:

6. Will the patient require care on an intermittent or reduced schedule basis, including any time for recovery?

Estimate the hours the patient needs care on an intermittent basis, if any:

_____ hour(s) per day; _____ days per week    from _____ through _____

Explain the care needed by the patient, and why such care is medically necessary:

Page 3                                     CONTINUED ON NEXT PAGE                    Form WH-380-F  Revised May 2015

# Redacted for Privacy

7. Will the condition cause episodic flare-ups periodically preventing the patient from participating in normal daily activities?

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: _____ times per _____ week(s) _____ month(s)

Duration: _____ hours or ___ day(s) per episode

Does the patient need care during these flare-ups?

Explain the care needed by the patient, and why such care is medically necessary: _____

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

**Signature of Health Care Provider** _____  **Date** 12/24/2018

## PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# Redacted for Privacy

CONTINENTAL 000025

*gawcpi@att.net*

**Designation Notice**
**(Family and Medical Leave Act)**

**U.S. Department of Labor**
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 5/31/2018

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form by employers is optional, a fully completed Form WH-382 provides an easy method of providing employees with the written information required by 29 C.F.R. §§ 825.300(c), 825.301, and 825.305(c).

To:    _Gary Washington_

Date:  _1/7/2019_

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided.
We received your most recent information on ___1/7/2019___ and decided:

 ✓    **Your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave.**

The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement:

_____  Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: _____

 ✓    Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

**Please be advised (check if applicable):**
_____  You have requested to use paid leave during your FMLA leave. Any paid leave taken for this reason will count against your FMLA leave entitlement.

 ✓    We are requiring you to substitute or use paid leave during your FMLA leave.

_____ You will be required to present a fitness-for-duty certificate to be restored to employment. If such certification is not timely received, your return to work may be delayed until certification is provided. A list of the essential functions of your position ___ is ___ is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

_____  **Additional information is needed to determine if your FMLA leave request can be approved:**

_____  The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request. You must provide the following information no later than _____, unless it is not
                                                                                    (Provide at least seven calendar days)
practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

_____
(Specify information needed to make the certification complete and sufficient)
_____

_____  We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later time.

_____  Your FMLA Leave request is Not Approved.
_____  The FMLA does not apply to your leave request.
_____  You have exhausted your FMLA leave entitlement in the applicable 12-month period.

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. §§ 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 – 30 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.**

**EXHIBIT 10**

Form WH-382 January 2009

CONTINENTAL 000027



CONTINENTAL 000078



Verizon LTE                11:24 AM                36%

Gary ›

Hello Oscar,

The funeral was good amd complete.  I will be back Apr 23. Could get any response from John if i needed to fill out any paperwork. God bless,

Gary

> Ok you get 3 days paid for bereavement anything over 4 days need to go through HR and Clayton

Apr 19, 2019, 12:21 PM

Okay, thanks.  The funds are no issue.  Be in there on evening of 23rd after class.  Thanks

Apr 27, 2019, 6:50 PM

Hey Oscar, thanks for everything. John 3:16-18

**EXHIBIT 14**

Text Message

  

       

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC 436-2020 00330 | |
| | and EEOC |

| | State or local Agency, if any | |
|---|---|---|

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Gary Washington | 803-238-4542 | Redacted for Privacy 1962 |

| Street Address | City, State and ZIP Code |
|---|---|
| 420 Lamme Chase | Johns Creek, GA 30097 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Continental Tire the Americas, LLC | 500+ | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1830 MacMillan Park Dr | Fort Mill, SC 29707 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 4/19/19 | 4/24/19 |
| | CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached for Complaint Supplement

RECEIVED
DIRECTOR

OCT 15 2019

EEOC
Greenville Local Office

**Designation of Representative**

Mr. Washington is represented by The Kirby G. Smith Law Firm LLC, located at 4488 N Shallowford Rd, Ste 105, Atlanta, GA 30338. His attorney should be reached by email at ack@kirbygsmith.com or by fax at (877) 352-6253.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Oct 15 2019         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date | |

CONTINENTAL 000098

## COMPLAINT SUPPLEMENT

Mr. Washington worked for Continental Tire (Continental) as a Tire Builder, beginning his employment in October 2017.

On April 3, 2019, Mr. Washington notified his supervisor, Mr. John Stein, that his mother had been admitted to the ICU and was near death. He asked Mr. Stein for permission to go on a leave of absence to care for his mother. Mr. Stein agreed and asked Mr. Washington to keep him updated. FMLA was not discussed as a possible option.

On April 10, Mr. Washington's mother passed away. On April 12, Mr. Washington notified Mr. Stein and his second level supervisor, Mr. Oscar Boyle, of her death. Mr. Boyle responded by text message, "Sorry to hear this news just as soon as y'all make plans just let me know and we can go from there." He did not mention FMLA leave as an option or refer Mr. Washington to Human Resources (HR). Mr. Washington attempted to reach Mr. Stein but did not receive a response.

On April 19, Mr. Washington contacted Mr. Boyle by text message and said he would like to return on April 23. Later that day, an HR representative called Mr. Washington and told him that Mr. Clayton Turner, Division Manager, would contact him shortly. The following day, Mr. Clayton terminated him.

Mr. Washington is 56 years old. He is the oldest Tire Builder by at least ten years; the average age for Mr. Washington's comparators is well under 40 years old. On at least two occasions in 2019, Mr. Stein referenced Mr. Washington's age and asked if he was considering retirement. This is sufficient for Mr. Washington to plead a *prima facie* claim of age discrimination.

CONTINENTAL 000099